You may proceed, Mr. Tyler. Good morning, Your Honors. Thank you. May it please the Court, my name is Robert Tyler from McGuire Woods. I'm here on behalf of the petitioner in this case, PARSONS GLOBAL, which has submitted a sponsored claim under the Contract Dispute Act on behalf of its subcontractor, O'Dell International. This appeal raises the question of jurisdiction of the Armed Services Board of Contract Appeals, specifically whether the claim, that sponsored certified claim, was a valid claim. And the parties appear to agree that the answer to that question, in turn, depends first upon whether the payment request was routine or non-routine, and secondly, whether PARSONS was required to have paid that claim, the money that it was requesting, that O'Dell had requested, before submitting that claim to the Board of Contract Appeals. If I understand, your argument comes down to whether this was routine or non-routine. Absolutely. Well, under Reflectone, our case, it defines non-routine as a demand for compensation for unforeseen or unintended consequences, and other cases add on to that that it was the fault of government. Do you, one, do you agree or disagree with that definition? And if you agree, how do you all, based on the facts of this case, fall into the definition of non-routine? To the first point, your Honor, I will agree that in Reflectone, the court said that a request for an adjustment is an example of a non-routine payment, and that is a situation in which you're talking about unforeseen or unintended consequences. That are generally the fault of the government, right? You're right, yes, that in that situation are generally the fault of the government, but I don't read Reflectone, and the court didn't say in Reflectone that only a request for equitable adjustment, or only unforeseen situations or unintended circumstances, or only situations that are the fault of the government, could constitute non-routine. So how would you redefine, or what would you add to the definition of non-routine? Well, I think also in Reflectone, you note that the court said that a routine payment is something that occurs under the contract. Non-routine is a request for payment outside the contract. But you submitted this request to the PCO, the Procurement Contracting Officer. Doesn't that almost alone dispose of this? I don't think so, your Honor. Something that was a fault of the government, or that would have gone to the TCO, right? Well, the original claim was, Parson submitted the original claim to the TCO as part of the termination process of those three task orders that issued the termination of those. The TCO indicated that he would not consider resolution of the subcontractor claim separate and apart from the entire settlement claim. So there was no avenue under the termination procedures to get that claim resolved. Yes, they then submitted the claim to the PCO. Was that a routine request for payment? We submit, your Honor, it could not have been because of the termination, because of the unique circumstance, situation here. This is not, this is... I don't know, I mean, I guess I'm missing something. Maybe I've got the facts wrong, really. But the payment you're seeking here has to do with this $175 markup with respect to direct labor costs for the subcontractor, right? Absolutely. Okay. That was something that the parties agreed to, the contractor and the subcontractor, in October of 2004. And that was with respect to payment under the contract. How is that anything other than routine? And I actually thought that you conceded in your brief that, well, if they had submitted it before the contract was terminated, it wouldn't be a routine payment, right? I think we would concede, your Honor, that had the accounting error not occurred, had the proper billing template had been used, and when those costs were incurred, had they been submitted during the course of performance of that contract, they would have been routine costs. But the issue isn't whether the costs are routinely incurred. The issue under the Federal Acquisition Regulation is whether the request for payment is routine or not. So you're saying what defines whether a cost is routine or non-routine is when the contractor decides to submit it? No, your Honor. I'm suggesting that under the language of the Federal Acquisition Regulations, the issue isn't whether the costs are routine or non-routine. The issue is whether the request for payment, the claim itself, is routine or non-routine. Mr. Turner, maybe another way to think of this is whether there's some kind of dispute, and at the time you submitted this request for payment, there's no dispute with the government, is there? Well, no, I don't believe there was, your Honor. The government hasn't failed to act or has not denied the request so that it's an item that's an issue between the government and the... That's correct, your Honor, and that's precisely why the issue rises and falls upon whether this is a routine request for payment or a non-routine. A routine request for payment would have to be in dispute for it to constitute a claim under the CDA. A non-routine request for payment, and again, the issue is whether it's the request, not whether it's the underlying costs. That's clear enough from the regulations. Under the circumstances of this case, where you've got a termination for convenience, a subsequently realized accounting error, an audit that comes in and recognizes that the accounting error was made, and a subcontract that effectively was left with no avenue for relief to recover the costs, again, these are incurred costs. This is not profit they're seeking. Under those circumstances, this request for payment is virtually unique. It's certainly out of the ordinary course of performance of the contract, and under the regulations, is non-routine. But part of the reason that this request is coming in so late is because you submitted it late. You're the one who submits it after the settlement period is closed. Part of the reason, you're right, the timing of that was O'Dell raised the issue with Parsons first in 2006. It was then after the DCCA audit results came out and said, yes, there was a billing error here. The markup should have been 175%. It was at that point that the claim was first submitted. But it's our position that the issue of whether or not these costs, incurred costs, should be repaid should not rise and fall as a matter of jurisdiction of the board on the timing of that claim for payment. The board relied upon the FAR. I thought you were telling us before that the factor that converted this from routine to non-routine was the timing of the submission. Your Honor, that's correct. What I'm saying, and perhaps I'm not being clear enough here. That also begs another question, which is, could a contractor routinely convert routine to non-routine simply by delay? By picking the time they want to submit it. If we wait long enough, we can make this into a claim and go to the Armed Services Board. Your Honor, I suppose there's always that risk. I'll stress that those are not the facts of this case. And I'll also point out that the issue... The rule I'm asking the court to adopt is simply applying the definition that's put forward in the Federal Acquisition Regulations. In this situation, you have a non-routine request for payment. Yes, part of that is dependent upon the timing of it. But it's not an issue of a contractor having deliberately delayed. You couldn't make a certification for the claim in that situation. Let me ask you from another direction. It seems to me that if Parsons were confident that this underpayment of the overhead would be reimbursed by the government, that there would be no reason not to have paid the subcontractor. And if, in fact, Parsons had paid the subcontractor these two million some dollars, then you'd have a different kind of claim without very much confidence because it's late, late discovered and so on, that it would be reimbursed. And so it looked to me as if what you really are looking for and all that you need and haven't gotten from the government is an assurance that if you pay it, it will be reimbursed under the contract because it was required by the contract in the first place. Yes, that's correct. That's correct, Your Honor. So that that's really the problem. But it hasn't... Parsons hasn't paid the difference because of this uncertainty. So it's a very curious cycle. Exactly. And the issue here is who is left holding the bag in the case of that uncertainty. It should be the subcontractor who's incurred these costs. The subcontractor has asked for Parsons to pay that. Parsons deferred, said we're going to submit it to the government. Now, Parsons isn't entitled to do that. Part of the other argument that the Board relied on here and the government advocates here is that Parsons was required to have satisfied that payment before submitting this claim. Yes, I saw that. Were they saying that Parsons was required to pay the subcontractor the 175% whether or not it was reimbursable by the government? I think the government, and perhaps Ms. Grisby can better articulate this, but my understanding of the government's position is that before submitting a claim, before there could be a claim, Parsons was required to have paid that amount. Right. Exactly. And you don't trust them? I don't trust... That when it's all done, that you'll recover that two-some million dollars that would have been recovered if all of this had been done? If all of this had occurred as a routine request for payment during the course of the contract, I have full confidence that if Parsons would have paid it, it would have been reimbursed. What we have here is a situation where Parsons has certified that it believes there's grounds for the claim and has acknowledged that it has a liability to pay that money that it receives from the government to Odell. That's why it's a sponsored certified claim under the Severan doctrine. And that's why Parsons is not required to have paid that as a matter of jurisdiction for this claim to be viable before the board. Can I just ask you a housekeeping kind of question? It seems to me going through the actual costs that comprise the two-point-something million that we're talking about here, there's 140,000 in close-up costs. No, you've not made, just to be clear, you've not made a separate argument that that's kind of a distinct separate thing that's outside of what you're asking for in terms of the 175,000. No, that has not been our argument. It was clear in the claim that was presented that there were claims under the three-task orders and there were close-up costs. And the government has made an issue and sought to file a certify and submitted an appendix on this issue. What the board said in its decision was there was some confusion over precisely how those related back to the three terminated task orders or whether there were close-up costs. The board didn't address that issue and I would simply put it's not the court's function here to act as a fact finder. Upon finding there is a claim in jurisdiction, it's the board's obligation to resolve that issue. If there are no further questions, I'll reserve the balance of my time. Thank you, Mr. Tyler.  May it please the court. This case is about Parson's desire to have the government mediate its billing dispute with its subcontractor, O'Dell International. At the outset, it deserves one point, which is that 2.4 million of this 2.5 million alleged claim has nothing to do with the termination of the task orders. The board noted on page 6 of the joint appendix in note 2 that there's some confusion of where those costs arise and on page 12 the board again said that Parson's has conceded that these costs have nothing to do with the termination and in fact the government has submitted a supplemental appendix. But that's not the problem, is it? These costs were incurred before the termination and had they been processed without error, I'm curious, blatant error that apparently nobody spotted, I gather from the government there'd be no question that the reimbursement would have been routine. Well, really the issue here is that these don't even arise under the terminated task orders. If you look at the supplemental appendix, which is part of what they call the claim that was submitted, it assigns task order 7 as the task order under which the 2.4 million arises. So it's not even related to task orders 4, 11 and 12. Throughout, Parson's and O'Dell have stated that they wanted these costs to be considered in conjunction. The DCAA audited and they said, look, you made a large mistake. So they finally realized they'd made a large mistake and are trying to correct it. DCAA noted in its audit report, this wasn't the content of the audit, it was an end note entitled, Other Matters to be Reported, that DCAA believed that there was a problem. DCAA has no authority to bind... They haven't disputed that they paid 75% instead of 175. The government hasn't even had an opportunity to examine what was paid, all of the circumstances surrounding the payment, whether Parson's is actually liable to O'Dell for the difference. There's DCAA, their prime purpose was to audit for task orders 4, 11 and 12. And they stated with respect to 4 and 11 and 12, they believe that there was a markup issue. However, again, it deserves no stepping back and supplemental appendix on the invoice that's submitted in pages 3 and 6, the task order assigned is not 4, 11 or 12. It's task order 7, which to this day is open. So their argument that there was just simply no mechanism to submit an invoice is not factually accurate. To this day, they can submit an invoice on task order 7 and have received... I thought there are no time limits to submitting invoices on routine requests? I mean, there's a suggestion. I was going to ask you about that too. Or how do they go about making it a dispute? Are you saying they don't need to make it a dispute because they can just routinely submit an invoice at this point? They could submit an invoice. Well, FAR provision 52.216-7B talks about allowable costs and it says, when the contractor is not delinquent in paying costs of contract reforms in the ordinary course of business, costs incurred but not necessarily paid for, for supplies, services purchased directly from the contract and associated financing, payments to subcontractors provided these payments determined due will be made in accordance with the terms and conditions of a subcontract or invoice. So there's no time limit there. Well, they say that they can't go... that after termination it has no means of submitting vouchers. So you're saying that's not correct? That's not correct. Those vouchers, they are still able to submit vouchers to the day. So why do you think we're still here? If you've been telling the other side, go ahead and submit your voucher. I mean, I assume there's no trick here. I mean, there's no time limit problem, whatever. They could submit their voucher now just as they could have before the contract terminated? It would be speculation, but there could be an issue in terms of the funds left on the task order, because under this cost reimbursement contract, it's the contractor and subcontractor's job to monitor the cost. So if they submitted the invoice, there's a possibility it would exceed the amount that's on the task order, but it's not the case that it deals with the terminated task orders. They may have chosen... Aside from that issue of vouchers, there's also a suggestion in the board opinion, maybe I'm not understanding this right, that how do they go about making this decision? You. They could submit an invoice. Or, with respect to the small amount, the $140,666, which we concede seemed to deal with the terminated task orders, they could have incorporated that into a termination settlement proposal. And under the FAR, under Part 49, then the next step would be for them to submit it. The government would give a response. They'd enter into negotiations. If at some point they reach an impasse, as we recognize under ELLIT, then that could mature into a claim. But the first step is either to incorporate it into a termination settlement proposal or to submit an invoice. They've done neither. This argument that this arises under a different order, number 7, is that part of your brief? Is that, this is hitting me quite, without my knowledge. Yes, Your Honor. In the brief, we did not separate out the amounts. After receiving the SIR reply, we filed a motion for leave to file, after receiving the reply, we filed a motion for leave to file a SIR reply, which this court denied without prejudice to raising the argument at oral argument and allowed us to supplement the appendix with the supplemental appendix, which has the actual documents, which reflect that these costs arise under Task Order 7. To the extent that Parsons made the argument in his reply that it simply couldn't invoice these costs, when in response to our suggestion that it could, we found it necessary to raise this issue because that's simply inaccurate with respect to the vast majority of the costs. Can I ask you another issue? This is not necessarily germane to the main issue before the Board, but the Board also said that Parsons should have paid his subcontractor, O'Dell, before filing a claim. And it seems to me, reading the cases, in particular Sovereign, they wouldn't be able to come forward with a claim if they, they require that they not have paid the subcontractor. The only way they can come forward with a claim is if they are still liable to their subcontractor. Once they've paid off the subcontractor, they can no longer come forward. Now, that isn't, that doesn't necessarily affect the result here, but I'm a little puzzled by that, you know, observation by the Board. I wondered if you'd agreed with that. Not completely. They would have to either pay or determine its due, but that's going back just to the Everyone agrees that this billing issue did not arise because of any action by the government. So the government's only obligation to pay would be if it's due under the contract. And the only way it could be due under the contract is if Parsons determines that it's due in accordance with the terms and conditions of a subcontractor invoice. But they don't dispute that it's due. Their own auditor said it's due. They said, you've done this, you've made a mistake. And now the idea is that the government is going to let them correct it. Well, it's not quite true that they don't dispute that it's due because they've offered no reason why, since 2006 when the issue first came to their attention, they did not simply pay and then attempt to invoice this amount. And in fact, it's in the joint appendix on 214. Their subcontractor, O'Dell, gives them the option of not paying costs that are not invoiced within 90 days. For whatever reason, they've determined that they should not pay. And it appears that Parsons may have defenses against O'Dell. And when such a dispute arises, should the responsibility fall upon the government or should it be for the contractor to resolve this dispute with the subcontractor? So that's really the question. They underbill the government by $2 million and are they going to have to live with it or is the government going to do the right thing and pay what they agreed to pay under the contract? Well, Parsons could pay O'Dell and in which case that could mature and then could submit its cost and invoice. And if the government denies the invoice, then they could submit a claim. That's why they're here. They did submit a claim. They thought they tried two different contracting offices. Both of them probably laughed at them. I don't know of contracting offices. I would think they would have thought this was very interesting that this large mistake was made by these giant contractors. And so the board threw them out and you say they can't get into court and they have no remedy, although it was the government who found the mistake and told them about it. But they do have a remedy. They could submit an invoice. Well, they want to be sure they have a remedy. That's why they went to the board, isn't it, or to the contracting officer. So you agree that you'll reimburse this amount that you should have been billed in the first place. That is true, but it's not the contracting officer's role to resolve disputes between the prime contractor and the subcontractor. It's the contracting officer's role to resolve disputes between the prime contractor and the government. There wasn't a dispute. Everyone agrees there was a mistake. There's no argument that the mistake was made. There's no argument that the contract, which the government agreed, said 175%, not 75%. So nothing's in dispute. The question is how now can they traverse the machinery to get somebody's attention? And so far they've lost it every turn. They tried two different contracting officers, tried the board. Here they are. You won't give them the time of day. Well, it may seem that there is a lot of machinery involved, but again, the options are simple. Either submit an invoice, either pay it, but at least determine that it's due, or to amend it and put in a termination settlement proposal. That's their problem. They say, if we pay it, will you reimburse us? And nobody has told them yes. They asked for the termination contracting officer to approve their payments initially, and the terminating contracting officer simply advised them that under the termination that they chose not to settle separately with the subcontractor directly under 49-108-8. So they went to another contracting officer, having been told, despite being a very sophisticated contractor, that no, you haven't complied with our rules. But the contractor could reach a settlement with the subcontractor, pay the subcontractor, and then again, either submit an invoice or termination settlement proposal. Because the litigation has dragged on for this long, it may seem that there's a lot of machinery, but really the steps that were told to Parsons since 2008 were simple. Either submit a termination settlement proposal or submit an invoice, both of which are relatively routine under the contract. I'm glad to hear you say that, but I haven't yet heard you say that the government will reimburse this payment. If Parsons pays O'Dell, then the government will consider the cost. But what about my question about sovereignty? May I have a question about whether or not, if they go ahead and pay that, they can still sort of go forward if they're no longer liable to the subcontractor. Do you think under sovereign, if they pay, that's no problem, they can still go forward with the claim? Well, if they pay it and then they submit an invoice to the government, it wouldn't necessarily be a pass-through claim. It would be in the form of, I guess, an equitable adjustment, stating that they incurred these costs and that the government never paid them. So they would have a direct action against the government for the excess cost. I mean, they could request the cost that way, but they still would have a form of action. It just wouldn't be in the form of a pass-through claim in the nature of sovereign. But the problem here is, under sovereign and Mitchell and Transamerica and Yates and all those cases at this site, those are an equitable adjustment where there is some allegation that the government harmed the subcontractor. So yes, in those circumstances, the only way the subcontractor can recover is to reach an agreement with the prime to go after the government. But here, the government hasn't done anything. Someone from the government, an agency with no binding authority to interpret the subcontractor, has merely pointed out that there may have been a mistake made with respect to the markup issue. Yeah, but your view is that it's just a matter... The decision before us has to do with jurisdiction of the board. And it's a legal question as to whether or not they had jurisdiction or not. On the second question, which is whether or not there's some liability with the government or whatever, you're saying here this is kind of an unusual case because often there's one shot and you miss it, but this party still has the ability to have some adjudication or some hearing with respect to the merits of their argument on what the government is allegedly owed. Yes, Your Honor. And if there are no further questions, we request that you affirm the board's dismissal of Carson's alleged claim. Thank you, Ms. Grigsby. Mr. Tyler, why don't you just submit an invoice? Because we're not required to, Your Honor. The Severan Doctrine allows for pass-through sponsored certified claims. And given the history here, setting aside the issue of a billing error, which we acknowledge there was a billing error, the issue is who is left holding the bag for that. Well, but now you're swimming upstream here trying to convince us that this is a non-routine request. Why don't you just submit an invoice? We haven't submitted an invoice, Your Honor, because we were told to file a claim, which we did. What we're hearing from the government today is... You were told? Who told you? Well, that was the next step after the TCO said, we will not consider this as part of the termination settlement. We will not settle the subcontractor's claim separately. Now, did the TCO say, you must file a claim? No, he didn't. But that was the next step. There was no... The contract, the task orders having been terminated, there was no option for a routine request for payment. You couldn't submit a voucher, a payment, an invoice. Now the government is telling us today, oh, sure, you could. We would consider that. And in response to a question, would it be paid? I heard counsel say, well, we still had to consider it. Well, that's a different question. You don't know even if the board here had jurisdiction. Nobody can guarantee you. We're talking about what form you use to try to get a review of your thing. There's no guarantee. Even if we were to reverse the board, nobody's going to write you a check based on anything we do. Absolutely. And I think your suggestion is that this is like out of the blue. It seemed to me that there were certainly suggestions in the board opinion and even a reference to, according to the government, that you ought to try this alternative mechanism. So I don't... You're not suggesting, right, that suddenly the government this morning has come up with some notion that you have another alternative and you've never heard of this before. No, but what I'm suggesting, Your Honor, is that we feel like Charlie Brown trying to kick field goals with Lucy. The ball keeps getting taken away. Every time we've gone through this, the government won't say, we're going to pay this. Parsons can't say, we're going to pay this. You don't have to say that until you submit a valid request, a claim, either a claim or, in this case, my clerk upstairs has checked and says, absolutely, the task order 7 is where the funds are located. Why haven't you just submitted a valid invoice under task order 7? The performance under task order 7 ended, and this is far outside the board's opinion, outside the jurisdictional issue, but task order 7, performance ended in March 2006. Parsons hasn't billed any time to that since 2006. There was a separate task order that was opened to handle administrative closeout costs. So you're worried about that one too? Yes, Your Honor. We're worried that... Remember, this problem starts because... Of a billionaire, which we acknowledge. Yes. Absolutely, and the issue... You made a mistake, and so you're trying to correct your own mistake. It seems like you have to take every possible recourse to do that. Your Honor, if I could just conclude. Yes, sure, please. We would submit that we have done that. We followed what the decisions of this court and the acquisition regulations say to do. I believe we've done that by following the sponsor certified plan and that the board acted improperly in denying jurisdiction. All we want is to get that claim assessed. That's all we're asking for, Your Honor. Thank you. Thank you, Your Honor. Thank you.